IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DONALD W. RAGER,
     Plaintiff,

vs.                           Case No.: 5:15cv35/MW/EMT

WARDEN PAIGE AUGUSTINE, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Donald W. Rager ("Rager"), an inmate of the federal Bureau of Prisons ("BOP"), proceeds pro se and in forma pauperis in this action brought under 28 U.S.C. § 1331 and Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d (1971).  Presently before the court is an amended motion for summary judgment, with supporting materials, filed by Defendants Craig Simmons, Harrell Watts, and Thomas Malone (ECF No. 162).  Rager filed a response in opposition to Defendants' motion, with supporting materials (*see* ECF No. 172, and exhibits at ECF Nos. 165, 174).  Defendants filed a reply (ECF No. 175).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N. D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); Fed. R. Civ. P.

72(b). After careful consideration of all issues raised by the parties, it is the opinion

of the undersigned that Defendants are entitled to summary judgment.

## I.     BACKGROUND AND INTRODUCTION

Rager was housed in the Federal Correctional Institution in Marianna, Florida

("FCI-Marianna") at the time of the events giving rise to this action[1] (*see* First

Amended Complaint, ECF No. 15 at 10).[2] The only claims that remain pending in this

lawsuit are Rager's First Amendment retaliation claims against the following four

Defendants: (1) Harrell Watts, the BOP National Administrative Remedy Coordinator

("National Coordinator") at all times relevant to this action; (2) Craig Simmons, the

BOP Southeast Regional Administrative Remedy Coordinator ("Regional

Coordinator"); (3) Paige Augustine, former Warden, FCI-Marianna; and (4) Thomas

Malone, a Lieutenant assigned to the Special Housing Unit ("SHU") at FCI-Marianna

(*see* Order on Report and Recommendation, ECF No. 106).[3]   Rager claims that

---

[1] Rager was housed at FCI-Elkton, in Lisbon, Ohio, when he commenced this lawsuit, and he is still housed there (*see* ECF No. 1 at 2; ECF No. 174).

[2] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system.

[3] The district court previously dismissed all of Rager's Fourth, Fifth, Eighth, and Fourteenth Amendment claims (*see* ECF No. 106 at 3). For the reasons discussed in the undersigned's Report and Recommendation issued on November 29, 2016 (ECF No. 103), Rager's First Amendment claims that are not discussed herein (i.e., Rager's claim that Lieutenant Buford used force on July 13, 2010, in retaliation for Rager's reporting improper and illegal conduct by FCI-Marianna staff (asserted in paragraphs 12 and 31 of the First Amended Complaint), and Rager's claims that

Lieutenant Malone, at the direction of Warden Augustine, retaliated against him for filing four requests for administrative remedy by threatening to place Rager in the SHU and that "things would turn out bad" unless Rager dropped the requests (*see* First Amended Complaint ¶¶ 18, 30, 32). Rager claims Regional Coordinator Simmons and National Coordinator Watts repeatedly rejected, returned, or denied Rager's administrative appeals for fraudulent, fictitious, or factually incorrect reasons, and failed to respond to Rager's administrative appeals within the time limits set forth in BOP policy, in a deliberate effort to prevent him from exhausting his administrative remedies, thus thwarting his access to the judicial process (*see id.*, ¶¶ 20–21, 33–34). Rager claims he suffered emotional and psychological distress, for which he seeks monetary damages (*see id.* at 21, ¶¶ A, C). Rager also seeks injunctive relief against the BOP, requiring the following:

> that grievances filed by inmates be accepted and answered within the prescribed time limitations without exception in accordance with FBOP Policy Statement 1330.18 and CFR Title 28, CFR 541, 542, and Title 28 CFR p. 40 sub A §40.7 (e), and to impose a penalty upon the Federal Bureau of Prisons, Department of Justice for its failure to comply, up to and including civil penalty and automatic granting of grievance and requested relief.

---

Defendants Copeland, Buford, Snell, Malone, Lewis, and Augustine's maintaining Rager in the SHU, changing his detention status from protective custody to "under investigation" to administrative detention, and threatening to transfer him to another institution unless he dropped his administrative grievances (asserted in paragraphs 10–19, 24, 25, 30, 32, and 35 of the First Amended Complaint)) are barred by the statute of limitations (*see* ECF No. 103 at 10–29).

(First Amended Complaint at 21 ¶ D).

Defendants Malone, Watts, and Simmons contend there is no genuine issue of material fact, and the facts show that Rager cannot satisfy two of the three elements of a retaliation claim (Amended Motion for Summary Judgment, ECF No. 162 at 8–22). Defendants contend Rager cannot show that any Defendant took adverse action against him, and Rager cannot show that any adverse action was motivated at least in part by Rager's filing administrative grievances (*id.*). Defendants additionally contend they are entitled to qualified immunity (*id.* at 22–30). Defendants also argue that the court should not recognize a <u>Bivens</u> remedy with respect to Rager's First Amendment retaliation claims (*id.* at 31–37).

In response, Rager argues that the facts viewed in the light most favorable to him show that Defendants took adverse action against him, and that their actions were motivated by his filing administrative grievances (Response to Amended Motion for Summary Judgment, ECF No. 172 at 2–10). Rager also contends Defendants are not entitled to qualified immunity, because they were not performing discretionary functions, they violated his First Amendment rights, and his First Amendment right to be free from retaliation was clearly established at the time of Defendants' conduct (*id.* at 10–13). In response to Defendants' <u>Bivens</u> argument, Rager acknowledges that

the Supreme Court has not expressly extended <u>Bivens</u> to First Amendment retaliation

claims in the prison context, but he argues the Court has assumed that a <u>Bivens</u>

remedy is available in such a context (*id.* at 13–14).  Rager further argues that all of

the circuit courts have recognized a <u>Bivens</u> remedy in the First Amendment retaliation

context, and that Congress implicitly provided a <u>Bivens</u> remedy (*id.*).

II.    LEGAL STANDARDS

    A.    <u>Summary Judgment</u>

In order to prevail on a motion for summary judgment, the moving party must

show that the nonmoving party has no evidence to support his or her case or present

affirmative evidence that the nonmoving party will be unable to prove his or her case

at trial.  *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L.

Ed. 2d 265 (1986).  If the moving party successfully negates an essential element of

the nonmoving party's case, the burden shifts to the nonmoving party to come forward

with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The

"mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is "genuine"

if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*  The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Speculation or conjecture from a party cannot create a genuine issue of material fact.  *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."  Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324.  The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

With regard to the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> . . . .
>
> **(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).

Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed. "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1294 (11th Cir. 2012)

(citing <u>Pritchard v. S. Co. Servs.</u>, 92 F.3d 1130, 1135 (11th Cir. 1996)). If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of summary judgment. *See* <u>Macuba v. Deboer</u>, 193 F.3d 1316, 1322 (11th Cir. 1999); *see* Fed. R. Civ. P. 56(c).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if the moving party's motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to it. *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her. *See* <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); <u>Jones v. Cannon</u>, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove. *See* <u>Celotex Corp.</u>, 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp.</u>, 477 U.S. at 322.

B.    <u>Qualified Immunity</u>

The defense of qualified immunity shields government officials performing discretionary acts "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1329 (11th Cir. 2008).

"Under the qualified immunity doctrine, government officials performing discretionary functions are immune not just from liability, but from suit, unless the conduct which is the basis for suit violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." <u>Sanders v. Howze</u>, 177 F.3d 1245, 1249 (11th Cir. 1999) (citing <u>Harlow</u>, 457 U.S. at 818).

"Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citation omitted). To be entitled to qualified

immunity, a public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* (internal quotation marks and citations omitted).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194. "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." Tolan v. Cotton, — U.S. —, 134 S. Ct. 1861, 1865, 188 L. Ed. 2d 895 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks whether the right in question was 'clearly established' at the time of the violation." *Id.*, 134 S. Ct. at 1865–66 (citations, internal quotation marks, and alterations omitted) (first ellipsis in original). The court has discretion to decide which question to address first. *See* Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

Qualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights. *See* Jones v. Fransen, 857 F.3d 843, 851 (11th Cir. 2017) (citations and quotation

marks omitted). The defense gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al–Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). In part, this defense recognizes the problems that government officials like correctional officers face in performing their jobs in dynamic and sometimes perilous situations. It is also designed to avoid excessive disruption of government services and to provide a direct way to end insubstantial claims on summary judgment. *Id.*

The clearly established law requirement provides government officials with the ability to anticipate what conduct will give rise to liability for a constitutional violation. *See* Anderson v. Creighton, 483 U.S. 635, 646, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). To that end, when officials are acting within their discretionary capacity, they "can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." *Id.* "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Al-Kidd, 563 U.S. at 741 (quoting Anderson, 483 U.S. at 640) (emphasis added). This imposes

an objective standard, and that objective standard is "measured by reference to clearly established law." Harlow, 457 U.S. at 818.

Because this objective standard is fundamental to the qualified immunity defense, the district court, in ruling on a motion for summary judgment, should determine if the law was clearly established at the time the incident occurred. As the Supreme Court explained:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful . . . . If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

Harlow, 457 U.S. at 818–19. In this way, both government officials and citizens are protected. If the law is not clearly established, then the court should dismiss the case against the government official. If the law was clearly established, then the claim against the government official should go forward, and summary judgment should be denied.

Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue, and it may also be obvious from "explicit statutory or constitutional statements" that certain conduct is unconstitutional. Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1209 (11th Cir. 2007); *see also* Taylor v. Barkes,

— U.S. —, 135 S. Ct. 2042, 2044, 192 L. Ed. 2d 78 (2015) ("We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate."). Furthermore, recognizing that the clearly established law question turns on the law at the time of the incident, the district court must consider the law "in light of the specific context of the case, not as a broad general proposition . . . ." Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). In other words, the facts of the case before the court must be materially similar to the facts in the precedent that clearly establishes the deprivation. *See* Merricks v. Adkisson, 785 F.3d 553, 559 (11th Cir. 2015) (citation omitted). To be clearly established, the precedent must give officials clear warning of unconstitutional conduct. *Id.*

   In considering the law to do this analysis, the district court should compare the facts of the case before the court that allege a constitutional deprivation with those cases that the party opposing the motion contends show the clearly established nature of the law. As the Eleventh Circuit has explained:

> For qualified immunity purposes, a pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about

whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. Minor variations in some facts (the precedent lacks arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents, leaving the law applicable—in the circumstances facing the official—not clearly established when the defendant acted.

Merricks, 785 F.3d at 559 (internal quotation marks omitted).

Earlier this year, the Supreme Court observed:

In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial.

Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

White v. Pauly, — U.S. —, 137 S. Ct. 548, 551–52, 196 L. Ed. 2d 463 (2017) (multiple citations, some quotation marks, and alterations omitted).

The court cannot consider just any case law to decide if a right was clearly established. Only binding opinions from the United States Supreme Court, the

Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis. *See* <u>McClish v. Nugent</u>, 483 F.3d 1231, 1237 (11th Cir. 2007).

C.    <u>Failure to State a Plausible Claim</u>

The court is statutorily required to review a prisoner complaint to determine whether the action is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. §§ 1915(e)(2)(B), 1915A. To survive dismissal at the screening phase, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (internal quotation marks and citation omitted). A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation and citation omitted).

The determination of whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679 (citation omitted). The pleader is not entitled to relief "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* (citing Fed. R. Civ. P. 8(a)(2)). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quotation and citation omitted). And "bare assertions" that "amount to nothing more than a formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." *Id.* at 681 (quotation and citation omitted). Stated succinctly:

> Pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Iqbal, 556 U.S. at 679. In civil rights cases, "[m]ore than mere conclusory notice pleading is required . . . . A complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) (quotation marks and alteration omitted).

D.    First Amendment Retaliation Claims

The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech. *See* <u>Crawford-El v Britton</u>, 523 U.S. 574, 588 n.10, 592–93, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998); <u>Farrow v. West</u>, 320 F.3d 1235, 1248 (11th Cir. 2003) (citations omitted). "First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment." <u>Boxer X v. Harris</u>, 437 F.3d 1107, 1112 (11th Cir. 2006). To prevail on a claim of retaliation, the inmate must establish these elements: (1) his speech was constitutionally protected; (2) the defendant's retaliatory conduct adversely affected the protected speech; and (3) there is a causal relationship between the retaliatory action and the protected speech. *See* <u>Douglas v. Yates</u>, 535 F.3d 1316, 1321 (11th Cir. 2008) (citing <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)). A prisoner's filing of a grievance concerning the conditions of his imprisonment is protected speech under the First Amendment. *See* <u>Douglas</u>, 535 F.3d at 1321 (internal quotation marks and citation omitted). As to the second element, the Eleventh Circuit employs a purely objective standard: "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." <u>Bennett</u>, 423 F.3d at 1253.

In adopting this objective standard, the Eleventh Circuit expressly rejected a subjective "actual chill" standard; in other words, a plaintiff need not show that the retaliatory conduct actually chilled his exercise of his First Amendment rights, rather, he need only show that the retaliatory acts would likely deter a person of ordinary firmness from exercising his or her First Amendment rights. *Id.* at 1254.

The third element, whether there was a causal connection between the retaliatory acts and the adverse effect on the speech, "asks whether the defendants were subjectively motivated to discipline because [the prisoner] complained of the conditions of his confinement." <u>Smith v. Mosley</u>, 532 F.3d 1270, 1278 (11th Cir. 2008). The subjective motivation issue is resolved under the burden-shifting formula of <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). *See* <u>Hartman v. Moore</u>, 547 U.S. 250, 260, 126 S. Ct. 1695, 64 L. Ed. 2d 441 (2006) (citing <u>Mt. Healthy</u>, 429 U.S. at 285–87; <u>Crawford-E:</u>, 523 U.S. at 593); <u>Smith</u>, 532 F.3d at 1278. Initially, the plaintiff must plead and provide sufficient evidence of the retaliatory motive and the adverse action. *See* <u>Hartman</u>, 547 U.S. at 259–60. "[U]pon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of . . . ." *Id.* at 260 (citing <u>Mt. Healthy</u>, 429

U.S. at 287).  In the context of a defendant's motion for summary judgment, however, the plaintiff has the ultimate burden of proof; therefore, the defendant need only point to evidence as to the legitimate reason, and the plaintiff must produce "affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Crawford-El, 523 U.S. at 600 (citing Liberty Lobby, Inc., 477 U.S. at 256–57).  And, because regulatory actions taken by prison officials are presumed to be reasonable, the inmate must produce "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." Crawford-El, 523 U.S. at 598 (citation omitted); Harris v. Ostrout, 65 F.3d 912, 916–17 (11th Cir. 1995).  To defeat a summary judgment motion, a plaintiff need not adduce clear and convincing evidence of improper motive, but he must produce evidence from which a jury could find by a preponderance of the evidence, that retaliation was the but-for cause of the challenged action.  *See* Crawford-El, 523 U.S. at 590–95, 600.  "If there is a finding that retaliation was not the but-for cause of the action complained of, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." Hartman, 547 U.S. at 260 (citing Mt. Healthy, 429 U.S. at 287); *see also* Crawford-El, 523 U.S. at 593.  Indeed, "action colored by some degree

of bad motive does not amount to a constitutional tort if that action would have been taken anyway." Hartman, *supra* (citing Crawford-El, 523 U.S. at 593; Mt. Healthy, 429 U.S. at 285–86).  However, "when nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, . . . retaliation is subject to recovery as the but-for cause of official action offending the Constitution."  Hartman, 547 U.S. at 256 (citing Crawford-El, 523 U.S. at 593; Mt. Healthy, 429 U.S. at 283–84).

III.    MATERIAL FACTS FOR PURPOSES OF SUMMARY JUDGMENT

As this case comes before the court on Defendants' motion for summary judgment, the court is required to view the facts in the light most favorable to Rager, the nonmoving party.  *See* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).  The court does so here, referring to Rager's verified First Amended Complaint (ECF No. 15) and the summary judgment materials of record.  *See* Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding that specific facts pled in a sworn complaint must be considered in opposition to summary judgment); Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1(B), (C), (F).  Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts.  *See* Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

According to BOP regulations, the Warden, Regional Director, and General Counsel are responsible for the implementation and operation of the Administrative Remedy Program ("AR Program") at the institution, regional, and Central Office levels, respectively. *See* 28 C.F.R. § 542.11(a). This responsibility includes the following:

> (1) Establish procedures for receiving, recording, reviewing, investigating, and responding to Administrative Remedy Requests (Requests) or Appeals (Appeals) submitted by an inmate;
>
> (2) Acknowledge receipt of a Request or Appeal by returning a receipt to the inmate;
>
> (3) Conduct an investigation into each Request or Appeal;
>
> (4) Respond to and sign all Requests or Appeals filed at their levels. At the regional level, signatory authority may be delegated to the Deputy Regional Director. At the Central Office level, signatory authority may be delegated to the National Inmate Appeals Administrator. Signatory authority extends to staff designated as acting in the capacities specified in this § 542.11, but may not be further delegated without the written approval of the General Counsel.

28 C.F.R. § 542.11(a). Inmates have the responsibility to use the AR Program in good faith and in an honest and straightforward manner. 28 C.F.R. § 542.11(b).

Generally, an inmate must first present an issue of concern informally to staff at his or her institution. *See* 28 C.F.R. § 542.13(a). Staff must attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy (or

formal grievance). *See id.* An inmate who is not satisfied with the Warden's response to his formal grievance may submit an appeal to the appropriate Regional Director. *See* 28 C.F.R. § 542.15(a). An inmate who is not satisfied with the Regional Director's response may submit an appeal on the appropriate form to the General Counsel. *See id.*

The Warden shall respond to a formal grievance within 20 calendar days. *See* 28 C.F.R. § 542.18. The Regional Director shall respond to a regional appeal within 30 calendar days. *See id.* The national Administrator, on behalf of the General Counsel, shall respond to a national appeal within 40 calendar days. *See id.* If the time period for response to a formal grievance or appeal is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level. *See id.* Staff shall inform the inmate of this extension in writing. *See id.* Staff shall respond in writing to all filed formal grievances or appeals. *See id.* If the inmate does not receive a response within the time allotted, including extension, the inmate may consider the absence of a response to be a denial at that level. *See id.*

Rager alleges Defendants retaliated against him for filing grievances concerning an alleged use of excessive force by Lieutenant Buford on July 13, 2010, and Rager's

placement in the SHU from July 13, 2010 to November 17, 2010 (First Amended

Complaint ¶ 25). On February 28, 2011, over three months after Rager was returned

to the general population from the SHU, Rager submitted four formal grievances,

which were assigned Case Nos. 629349, 629352, 629354, and 629355, respectively

(Affidavit of Donald W. Rager ¶ 1, ECF No. 165-1 at 1). In formal grievance No.

629349, Rager complained that he was in the SHU for 127 days, which exceeded the

90-day limit set forth in BOP policy (*see* Request for Administrative Remedy, ECF

No. 165-1 at 134). Rager also complained that institutional staff failed to timely

respond to his informal remedy request (*id.*). Rager complained that he had not been

returned to his "previous status" (*id.*). Rager requested return of his personal property,

reinstatement of his former work assignment, and "back pay" (*id.*). The institutional

remedy coordinator received formal Grievance No. 629349 on March 4, 2011 (*see*

Receipt–Administrative Remedy, ECF No. 165-1 at 136).

In formal grievance No. 629352, Rager complained that institutional staff

denied his request to obtain a copy of an investigative report concerning Lieutenant

Buford's use of force and a copy of the video which allegedly captured the use of

force on July 13, 2010 (*see* Request for Administrative Remedy, ECF No. 165-1 at

42). Rager again requested return of his personal property and "back pay" for the

period of time he was in the SHU (*id.*). The institutional remedy coordinator received

Grievance No. 629352 on March 4, 2011 (*see* Receipt–Administrative Remedy, ECF

No. 165-1 at 40).

In formal grievance No. 629354, Rager complained that staff failed to provide

a definitive answer as to the reason for his placement in the SHU and nature of his

status while in the SHU (*see* Request for Administrative Remedy, ECF No. 165-1 at

52). Rager also complained that staff failed to timely responded to his informal and

formal grievances (*id.*). Additionally, Rager again requested reinstatement of his

former work assignment, return of his personal property, and "back pay" (*id.*). The

institutional remedy coordinator received Grievance No. 629354 on March 4, 2011

(*see* Receipt–Administrative Remedy, ECF No. 165-1 at 54).

In grievance No. 629355, Rager again complained that institutional staff had

provided two different explanations for his placement in the SHU (*see* Request for

Administrative Remedy, ECF No. 165-1 at 11; First Amended Complaint ¶¶ 6, 25).

Rager also complained that staff had not followed BOP policies governing his

placement in the SHU, review of his placement, and the "follow-up requirements" (*see*

Request for Administrative Remedy, ECF No. 165-1 at 11). Rager again requested

reinstatement of his former work assignment, return of his personal property, and

"back pay" (*id.*). The institutional remedy coordinator received Grievance No. 629355 on March 4, 2011 (*see* Receipt–Administrative Remedy, ECF No. 165-1 at 12).

BOP policy requires the warden to establish procedures to allow for the informal resolution of inmate complaints. *See* 28 C.F.R. § 542.13. BOP policy provides that the warden is responsible for ensuring that effective informal resolution procedures are in place and that good faith attempts at informal resolution are made in an orderly and timely manner by both inmates and staff. *See* U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 1330.18, Section 7.

On March 22, 2011, Defendant Lieutenant Malone summoned Rager to the recreation office to discuss administrative remedy #629349, in which Rager complained about his prolonged placement in the SHU (Declaration of Thomas Malone ¶¶ 4–6, ECF No. 162-1). As previously noted, at the time of the meeting, Rager had already been released from the SHU. The meeting was an attempt to informally resolve Rager's complaint (Malone Decl. ¶¶ 4, 8). Prior to March 22, 2011, no one from the prison staff had attempted to informally resolve administrative remedy #629349, #629354, or #629355 with Rager (*see* Deposition of Donald W. Rager 13:1–24, Mar. 31, 2017; ECF No. 162-4). As the SHU Lieutenant, it was

Malone's duty to attempt informal resolution of any inmate's administrative remedy relating to being housed in the SHU (*id.* ¶ 8). Even though Rager had already been released from SHU, Malone was still assigned to attempt informal resolution of Rager's administrative remedy, because the subject matter of the complaint was related to Rager's prior placement in the SHU, which was Malone's area of expertise (*id.*).

Rager states that Malone had copies of four administrative remedies in his possession at the meeting of March 22, 2011, #629349, #629352, #629354, and #629355 (Rager Aff. ¶¶ 5–6).[4] Rager states Malone told him that Warden Augustine "sent" him to "make these go away" (Rager Aff. ¶ 6). Rager states Malone told him, "You were originally put in SEG [segregated housing such as the SHU] at your request for protection" (Rager Aff. ¶ 6). Rager states Malone stated, "You agreed to drop all of these grievances if we let you of [sic] SEG, so we let you out even though you should have been transferred" (*id.*). Rager states Malone stated, "What are you trying to accomplish?" (*id.*). Rager told Lieutenant Malone that Lieutenant Buford had lied in his statement and the incident report concerning the use of force on July

---

[4] Rager provides a conflicting statement in his verified First Amended Complaint. In his Complaint, Rager states that Malone referenced only a single administrative remedy, and that it was remedy #629352 (First Amended Complaint ¶ 18).

13, 2010 (*id.*). Rager states Malone responded that he could "throw you [Rager] back into the SHU . . . If you're saying a staff member lied against you that must mean you can't be on the compound with him" (*id.*). Rager states he told Malone that he "intended to bring this case to court," and Malone responded, "I look forward to going to court. I'm telling you they're going to believe me, whatever I say, over you" (Rager Aff. ¶ 6; *see also* First Amended Complaint, ¶ 18). Rager states Malone stated, "You need to drop these BP-9's [formal grievances] or else . . . If you don't, it's going to turn out bad for you." (Rager Aff. ¶ 6). Rager states Malone stated, "You had better drop it or else . . . it's not going to be good for you" (*id.*).

Lieutenant Malone denies that he made any of the statements attributed to him by Rager (Malone Decl. ¶ 9). Malone states he brought to Rager's attention the fact that Rager had been released from the SHU several months earlier, but Rager indicated he still wished to pursue his administrative remedy as a formal matter (*id.* ¶ 7).

After the March 22, 2011 meeting, Rager was permitted to pursue the grievance as a formal matter (Malone Decl. ¶ 7). Rager was never placed in the SHU during the remainder of his stay at FCI-Marianna, which ended in September of 2014, when

Rager was transferred to a lower security prison (Rager Dep. 18:7–9, Mar. 31, 2017; Defendants' Undisputed Statement of Facts ¶ 18).

On March 24, 2011, two days after the meeting between Malone and Rager, Warden Augustine responded to all four of Rager's formal grievances (Rager Aff. ¶ 7).  In response to No. 629349, Warden Augustine acknowledged Rager's complaints and requests (ECF No. 165-1 at 137).  Augustine denied the grievance for the following reasons:

> A review of this matter reveals you were placed in the SHU pending the outcome of an investigation regarding your safety.  Once the investigation was completed, you were released from the SHU. Program Statement 5270.07, Inmate Discipline and Special Housing Units, Chapter 9, Page 6, allows for extended placement in Administrative Detention (SHU) pending an investigation.  Staff investigators and administrators exercised discretion carefully prior to returning you to general population to ensure your safety, and the safe orderly running of the institution.

> Inmates are assigned to work details based on the needs of the institution at the time when the assignment is made.  There is no entitlement to a particular work detail.  However, you may request consideration from your unit team to return to your former assignment when there is an opening.

> Inmates are awarded performance pay for work actually performed. Performance pay is not an entitlement and you may not be paid for work you did not perform.

(ECF No. 165-1 at 137).

In response to No. 629352, Warden Augustine acknowledged Rager's complaints and requests (ECF No. 165-1 at 44). Augustine denied the grievance for the following reasons: (1) Rager's requests for BOP records (i.e., the investigative report and related video) must be made via a Freedom of Information Act request, (2) the Administrative Remedy Index indicated that responses to Rager's complaints and requests were provided in response to Rager's previous formal grievances in September and November of 2010, and (3) monetary damages could not be provided under the Administrative Remedy Program, and if Rager wished to seek monetary compensation for lost or damaged personal property, he could consider filing an administrative claim under the Federal Tort Claims Act, or the federal "small claims" statute, 31 U.S.C. § 3723 (*id.*).

In response to No. 629354, Warden Augustine acknowledged Rager's complaints and requests (ECF No. 165-1 at 56). Augustine responded that the staff investigator had advised Rager of the basis for his placement in SHU, and that the remainder of Rager's complaint was addressed in grievance Nos. 629349 and 629352 (*id.*).

In response to No. 629355, Warden Augustine acknowledged Rager's complaints and requests (ECF No. 165-1 at 13). Augustine denied the grievance as repetitive of grievance Nos. 629349, 629352, and 629354 (*id.*).

Rager states he did not file any more grievances regarding the use of force and his placement in the SHU on July 13, 2010 (Rager Aff. ¶ 8). However, the summary judgment record demonstrates that Rager did pursue appeals of these grievances at the regional and national levels, and he also filed a Freedom of Information Act request (*see* 165-1 at 16–18, 20–36, 45–50, 58–74, 140–61). Additionally, Rager filed formal grievances regarding other conditions of his confinement (Rager Aff. ¶ 9).

Rager admits, and the summary judgment record verifies, that prior to his filing the four grievances which were the subject of his meeting with Lieutenant Malone on March 22, 2011 (Nos. 629349, 629352, 629354, and 629355), Rager had previously filed other formal grievances concerning his placement in the SHU after he formally reported alleged misconduct by staff, specifically, formal grievance Nos. 604713, 624142, and 624146 (First Amended Complaint ¶ 23; ECF No. 165-1 at 94–131, 162–71). In Grievance No. 604713 Rager complained that his placement in the SHU was retaliatory and violated BOP policy, that he was being denied access to religious,

educational, and other activities, and that he lost his job assignment (ECF No. 165-1

at 95–99). Warden Augustine responded as follows:

> This is in response to your Request for Administrative Remedy receipted
> August 27, 2010. You complain that because you reported an allegation
> of staff misconduct, you have been subjected to conditions similar to
> disciplinary sanctions while in the Special Housing Unit (SHU). You
> complain of reduced access to programs and you request to be released
> from the SHU and returned to your previously assigned work detail and
> housing unit in general population.
>
> Program Statement 5270.08, "Inmate Discipline and Special Housing
> Units," Ch. 9, page 1, provides that "Administrative detention status is
> a non-punitive status in which restricted conditions of confinement are
> required only to ensure the safety of inmates or others, the protection of
> property, or the security or orderly running of the institution." You have
> been placed in SHU due to the nature of your allegation as a necessary
> precaution to ensure your safety. Your request to return to general
> population will not be considered until this matter has been fully
> investigated.
>
> Your request for Administrative Remedy is denied.

(ECF No. 165-1 at 99). Rager appealed Warden Augustine's response to Regional

Coordinator Simmons (*see id.* at 100–07). Regional Coordinator Simmons responded

as follows:

> This is in response to your Regional Administrative Remedy Appeal
> receipted October 5, 2010. You allege staff at the Federal Correctional
> Institution (FCI) in Marianna, Florida, have assigned you to the Special
> Housing Unit (SHU) for an extended period of time without a detailed
> explanation. In addition, you allege you have not been afforded the same
> programs as inmates in general population. You request to be released

from SHU and be returned to the general population. You further request to be re-assigned to the same programs and job assignment you held prior to being placed in SHU.

A review of this matter revealed you are assigned to SHU in administrative detention due to an incident you may have been involved in. The incident is currently being investigated. This investigation is being conducted in accordance with national policy and applicable laws. Program Statement 5270.07, Inmate Discipline and Special Housing Units, Chapter 9, Pages 6 and 7, allows for extended placement in Administrative Detention when it is not determined prudent to release an inmate to general population. Staff are responsible for the safety and security of all inmates and the orderly running of the institution.

In regards to programs offered in SHU, inmates are afforded the opportunity to participate in programs in education, law library, and recreation. You may request participation in these areas through your unit team.

Accordingly, this response to your Regional Administrative Remedy Appeal is for informational purposes only. If dissatisfied with this response, you may appeal to the Office of General Counsel, Bureau of Prisons, 320 First Street, NW, Washington, D.C. 20534. Your appeal must be received in the Office of General Counsel within 30 calendar days of the date of this response.

(ECF No. 165-1 at 107). Rager appealed Regional Coordinator Simmons' response

to the Central Office (*id.* at 108–14). A representative of National Coordinator Watts

responded as follows:

This is in response to your Central Office Administrative Remedy Appeal, in which you contend you have been held in Administrative Detention of the Special Housing Unit (SHU), and you have not been afforded the same programs available to inmates in the general

population. You request to be granted the same privileges as inmates in the general population. You also seek the results of the investigation regarding alleged staff misconduct.

Records indicate you are no longer housed in the SHU, therefore your access to programs is no longer relevant.
. . . .
As to your request for the results of the investigation, inmates do not have any entitlements to be advised of the investigation or the results.

The above is provided for your information.

(ECF No. 165-1 at 114).

In grievance No. 624142, Rager essentially complained about the responses he had received to grievance No. 604713 (*see* ECF No. 165-1 at 116–18). Rager complained that officials had not provided a definitive answer as to why he was placed in the SHU (*id.*). Rager complained that the failure to provide a definitive answer impeded his rights to effectively use the grievance procedure because it prevented him from making "a pointed arguement [sic] of the facts of the case" (*id.* at 117). On October 8, 2010, the same day that institutional staff responded to Rager's informal grievance No. 624142, Rager submitted informal grievance No. 624146, again complaining that his access to the grievance process was being impeded (*see* ECF No. 88-1 at 21).

Rager alleges between January of 2011 and May of 2014, Regional Coordinator Simmons and National Coordinator Watts repeatedly rejected, returned, or denied Rager's administrative appeals for fraudulent, fictitious, or factually incorrect reasons, and failed to respond to Rager's administrative appeals within the time limits set forth in BOP policy (First Amended Complaint ¶¶ 20–21, 23, 26, Rager Aff. ¶¶ 6–23, ECF No. 174).

Defendant Simmons, as an Administrative Remedy Coordinator for the Southeast Regional Office ("SERO"), monitored the Administrative Remedy Program at SERO and ensured that appropriate SERO staff had knowledge needed to operate the procedure (Declaration of Craig Simmons ¶ 4; ECF No. 162-2). Simmons signed the rejection notices and ensured the accuracy of entries in SENTRY, the BOP's national on-line automated information system (*see id.*; *see also* BOP Program Statement 5890-13, Section 5). Also, Simmons was the point of contact for the Southeast Regional Director in discussions of Administrative Remedies appealed to the Central Office (Simmons Decl. ¶ 4). Simmons accomplished all of the above with the assistance of other SERO personnel, who were assigned to his department and others at the Regional Office (*id.*). Specific functions and tasks pertaining to the processing/investigation of appeals and preparation of responses to the inmate were

delegated to the appropriate staff members (*id.*).  When Regional Coordinator Simmons was out of the office or unavailable, the Administrative Remedy Coordinator role was handled by other SERO staff members (Simmons Decl. ¶ 5).

As an Administrative Remedy Coordinator, Simmons signed rejection notices in instances where inmates failed to submit their administrative remedies in accordance with policy (Simmons Decl. ¶ 6).  BOP regulations and policy specifically permit a regional office to reject administrative remedy filings for failure to conform to filing requirements.  *See* 28 C.F.R. § 542.15; BOP Program Statement 1330.18, Section 9.  The reasons for rejections include such things as the submission being illegible, not submitted on the form designed for regional appeals, filed at the wrong office, not in compliance with the page-count limitation, and untimely, among other things (Simmons Decl. ¶ 7).  *See* 28 C.F.R. § 542.15; BOP Program Statement 1330.18, Section 9.  The rejection notices sent to inmates are forms that inform inmates of the reasons for the rejection, and in most circumstances, provide the inmate with instructions for correcting the deficiency and allow additional time for the inmate to resubmit the administrative remedy (*id.*).  *See* BOP Policy Statement 1330.18, Section 11.  In some circumstances, the deficiency cannot be corrected, such as when

the submission is untimely filed (*id.*).  These forms are largely identical in each case with small variations depending on the nature of administrative remedy filing (*id.*).

During the years at issue in this case, the Regional Office received approximately 6,000 administrative remedy submissions per year covering a variety of topics (Simmons Decl. ¶ 8).  This number fluctuated from year to year, but generally, this was a fair representation of the volume of submissions received each year (*id.*).  Because of the large number of administrative remedy submissions, it was important that inmates adhered to the filing requirements with regard to form, timeliness, and other matters (*id.*).  The administrative remedy program would become unworkable without procedural rules for filing submissions (*id.*).

With such a large number of administrative remedy submissions, Regional Coordinator Simmons could not recall unaided any inmate's administrative remedy submission (Simmons Decl. ¶ 10).  Simmons does not have any independent recollection of Rager or any of Rager's administrative remedy filings, but Simmons was provided some information from the BOP's SENTRY computer system's indexes of Rager's administrative remedy filings to help prepare the declaration submitted in this case (*id.*).  After reviewing the SENTRY computer system's index data available for Rager's administrative remedy filings, Simmons states that a number of Rager's

filings were rejected for failing to comply with the requirements outlined in BOP regulations and policy, for example, failing to submit the administrative remedy to the appropriate office, submitting the remedy in an untimely fashion, or failing to use the proper number of forms (Simmons Decl. ¶ 14). *See* 28 C.F.R. § 542.15; BOP Program Statement 1330.18. Simmons states Rager was informed of these errors in the rejection notices that were sent to him and, where appropriate, Rager was given additional time to correct the errors and resubmit his administrative remedies (*id.*).

Inmates may appeal rejections of remedy submissions to the next appeal level (Simmons Decl. ¶ 16). *See* BOP Program Statement 1330.18, Section 11.c. If Rager felt that Regional Coordinator Simmons improperly rejected one of his regional appeals, Rager could appeal the rejection to the Central Office (*id.*). Additionally, BOP policy permits inmates to advance to the next level of the Administrative Remedy Program if they do not receive a response within the time allotted for reply (Simmons Decl. ¶ 15). *See* BOP Program Statement 1330.18, Section 12. Thus, if Rager did not receive a response from the Southeast Regional Office, he could proceed to the Central Office level (*id.*).

Regional Coordinator Simmons never met Rager, does not know Rager, has never been to FCI-Marianna, and has never had any personal interaction with Rager

(Simmons Decl. ¶ 12). At the time in question, Simmons did not know any of the FCI-Marianna employees about whom Rager complained (*id.*, ¶ 13). Although Simmons has no independent recollection of Rager's administrative remedy submissions, other than reviewing some official documentation, Simmons states he never would have knowingly or intentionally rejected, denied, or provided a late response to an administrative remedy filed by Rager on an improper basis (*id.*, ¶ 11). Simmons states Rager was treated the same as any other inmate when this occurred with his administrative remedy submissions (*id.*, ¶ 14).

Defendant Watts, as the National Coordinator, was responsible for the general supervisory management and oversight of the operation of the BOP's review and response to Central Office Administrative Remedy Appeals filed pursuant to the provisions of 28 C.F.R. § 542.10, *et seq.* (Declaration of Harrell Watts ¶ 4, ECF No. 162-3). Watts accomplished this with the assistance of other BOP personnel, who were assigned to his staff and others at the Central Office (*id.*). Watts delegated specific functions and tasks, pertaining to the investigation of appeals and preparation of responses to the inmate, to the appropriate staff (*id.*). Watts was also responsible for signing any rejection notices in instances where inmates failed to submit their administrative remedies in accordance with policy (*id.*, ¶ 5). The Code of Federal

Regulations and BOP policy specifically permit the Central Office to reject administrative remedy filings for failure to conform to filing requirements (*id.*). *See* 28 C.F.R. § 542.15; BOP Program Statement 1330.18, Section 9. The reasons for rejections include such things as the submission being illegible, not submitted on the form designed for regional appeals, filed at the wrong office, not in compliance with the page-count limitation, and untimely, among other things (Watts Decl. ¶ 6). *See* 28 C.F.R. § 542.15; BOP Program Statement 1330.18, Section 9. The rejection notices sent to inmates are form letters that inform the inmates of the reasons for the rejection and, in most circumstances, provide the inmate with instructions for correcting the deficiency and allow additional time for the inmate to resubmit the administrative remedy (*id.*). In some circumstances, the deficiency could not be corrected, such as when the submission is untimely filed (*id.*). These form letters are largely identical in each case with small variations depending on the nature of administrative remedy filing (*id.*).

The Central Office receives approximately 10,000 administrative remedy submissions per year covering a variety of topics (Watts Decl. ¶ 7). This number fluctuates from year to year, but generally, this was a fair representation of the volume of submissions received each year (*id.*). Because of the large number of

administrative remedy submissions, it was important that inmates adhered to the filing requirements with regard to form, timeliness, and other matters (*id.*). The administrative remedy program would become incredibly inefficient without procedural rules for filing submissions (*id.*).

With such a large number of administrative remedy submissions, National Coordinator Watts rarely recalled any individual inmate's administrative remedy submission (Watts Decl. ¶ 8). Watts has no independent recollection of any of Rager's administrative remedy filings but was provided official documentation of Rager's administrative remedy filings in order to prepare his declaration and respond to this lawsuit (*id.*). Watts states that, after reviewing the transactional data available for Rager's administrative remedy filings, a number of Rager's filings were rejected based upon common errors such as submitting the administrative remedy to the wrong office, submitting the remedy in an untimely fashion, or failing to use the proper number of forms (Watts Decl. ¶ 10). *See* 28 C.F.R. § 542.15; BOP Program Statement 1330.18 (*id.*). Watts states Rager was informed of these errors in the rejection notices that were sent to him and, where appropriate, Rager was given additional time to correct the errors and resubmit his administrative remedies (*id.*).

National Coordinator Watts never met Rager and never had any personal interaction with him (Watts Decl. ¶ 9). Watts does not know any of the FCI-Marianna employees about whom Rager states he complained, and states he had no reason to retaliate against Rager on those employees' behalf (*id.*). Although Watts has no recollection of Rager's administrative remedy submissions, other than reviewing official documentation to respond to this suit, Watts states he would never have knowingly or intentionally rejected, denied, or provided a late response to an administrative remedy filed by Rager on an improper basis (*id.*). Watts states Rager was treated the same as any other inmate when this occurred with his administrative remedy submissions (*id.*, ¶ 10).

## IV.  DISCUSSION

### A.    Availability of Bivens Remedy

To the extent Rager's First Amended Complaint may be liberally construed as including a request for nominal damages, the court must determine whether the First Amendment gives rise to an implied right of action for damages against federal officers who violate that Amendment's guarantees.[5] In <u>Bivens</u>, the Supreme Court

---

[5] Rager may not recover compensatory or punitive damages for alleged mental and emotional injury suffered as a result of the alleged First Amendment violations, because he has not alleged or shown he suffered any physical injury as a result of the alleged retaliation by Lieutenant Malone, Warden Augustine, Regional Coordinator Simmons, or National Coordinator Watts. *See* 42 U.S.C. § 1997e(e).

recognized an implied right of action against federal officers for violations of the Fourth Amendment. 403 U.S. at 397. After <u>Bivens</u>, the Supreme Court extended the judicially inferred damages remedy under <u>Bivens</u> in two contexts. In <u>Davis v. Passman</u>, the Supreme Court approved a <u>Bivens</u> remedy under the equal protection component of the Fifth Amendment against a Congressman for employment discrimination. *See* <u>Davis v. Passman</u>, 442 U.S. 228, 248–49, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979). In <u>Carlson v. Green</u>, the Supreme Court approved a <u>Bivens</u> action under the Eighth Amendment against federal prison officials for failure to provide medical treatment. *See* <u>Carlson v. Green</u>, 446 U.S. 14, 24–25, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980). These three cases—<u>Bivens</u>, <u>Davis</u>, and <u>Carlson</u>—represent the only instances in which the Supreme Court has approved of an implied damages remedy under the Constitution itself.

In 2009, the Supreme Court made clear that expanding the <u>Bivens</u> remedy is now a "disfavored" judicial activity. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). This is in accord with the Court's observation that it has "consistently refused to extend <u>Bivens</u> to any new context or new category of defendants." <u>Corr. Serv. Corp. v. Malesko</u>, 534 U.S. 61, 68, 122 S. Ct. 515, 151 L.

Ed. 2d 456 (2001).  Indeed, the Court has refused to extend <u>Bivens</u> for the past 35 years.

For example, the Court declined to create an implied damages remedy in the following cases:  a First Amendment suit against a federal employer, <u>Bush v. Lucas</u>, 462 U.S. 367, 390, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983); a race-discrimination suit against military officers, <u>Chappell v. Wallace</u>, 462 U.S. 296, 297, 304–05, 103 S. Ct. 2362, 76 L. Ed. 2d 586 (1983); a substantive due process suit against military officers, <u>United States v. Stanley</u>, 483 U.S. 669, 671–72, 683–84, 107 S. Ct. 3054, 97 L. Ed. 2d 550 (1987); a procedural due process suit against Social Security officials, <u>Schweiker v. Chilicky</u>, 487 U.S. 412, 414, 108 S. Ct. 2460, 101 L. Ed. 2d 370 (1988); a procedural due process suit against a federal agency for wrongful termination, <u>FDIC v. Meyer</u>, 510 U.S. 471, 473–74, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994); an Eighth Amendment suit against a private prison operator, <u>Malesko</u>, 534 U.S. at 63; a due process suit against officials from the Bureau of Land Management, <u>Wilkie v. Robbins</u>, 551 U.S. 537, 547–48, 562, 127 S. Ct. 2588, 168 L. Ed. 2d 389 (2007); an Eighth Amendment suit against prison guards at a private prison, <u>Minneci v. Pollard</u>, 565 U.S. 118, 120, 132 S. Ct. 617, 181 L. Ed. 2d 606 (2012); and Fourth and Fifth Amendment claims by federal detainees against high executive officers in the

Department of Justice and wardens of a federal detention facility for imposing

restrictive conditions of confinement and frequent strip searches, Ziglar v. Abbasi, 137

S. Ct. 1843, 1859–60, 198 L. Ed. 2d 290 (2017).

When a party seeks to assert an implied cause of action under the Constitution

itself, separation-of-powers principles are central to the analysis. *See* Ziglar, 137 S.

Ct. at 1857. As the Court explained in Ziglar:

> The question is "who should decide" whether to provide for a damages
> remedy, Congress or the courts?" Bush, 462 U.S. at 380, 103 S. Ct.
> 2404.
>
> In most instances, the Court's precedents now instruct, the
> Legislature is in the better position to consider if "'the public interest
> would be served'" by imposing a "'new substantive legal liability.'"
> Schweiker, supra, at 426–427, 108 S. Ct. 2460 (quoting Bush, supra, at
> 390, 103 S. Ct. 2404). As a result, the Court has urged "caution" before
> "extending Bivens remedies into any new context." Malesko, supra, at
> 74, 122 S. Ct. 515. The Court's precedents now make clear that a Bivens
> remedy will not be available if there are "'special factors counselling
> hesitation in the absence of affirmative action by Congress.'" Carlson,
> 446 U.S. at 18, 100 S. Ct. 1468 (quoting Bivens, 403 U.S. at 396, 91 S.
> Ct. 1999).

137 S. Ct. at 1857.

The Supreme Court has not defined the phrase "special factors counselling

hesitation," but the necessary inference is that the inquiry "must concentrate on

whether the Judiciary is well suited, absent congressional action or instruction, to

consider and weigh the costs and benefits of allowing a damages action to proceed."

Ziglar, 137 S. Ct. at 1857–58. Thus, to be a "special factor counselling hesitation," a factor "must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858.

The Ziglar Court continued:

It is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations. Yet the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies. These and other considerations may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case.
. . . .
In sum, if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.

In a related way, if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new Bivens cause of action. For if Congress has created "any alternative, existing process for protecting the [injured party's] interest" that itself may "amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Wilkie, supra, at 550, 127 S. Ct. 2588; *see also* Bush, supra, at 385–88,

103 S. Ct. 2404 (recognizing that civil-service regulations provided alternative means for relief); <u>Malesko</u>, 534 U.S., at 73–74, 122 S. Ct. 515 (recognizing that state tort law provided alternative means for relief); <u>Minneci</u>, supra, at 127–130, 132 S. Ct. 617 (same).

<u>Ziglar</u>, 137 S. Ct. at 1858.

The first question to be decided is whether Rager asks for a <u>Bivens</u> remedy in a new context. The Supreme Court has issued decisions in <u>Bivens</u> cases involving First Amendment claims, but did so without deciding whether <u>Bivens</u> extends to First Amendment claims. *See, e.g.*, <u>Wood v. Moss</u>, 134 S. Ct. 2056, 2066, 188 L. Ed. 2d 1039 (2014) (assuming without deciding that <u>Bivens</u> extended to First Amendment claim that Secret Service agents violated protestors' First Amendment right by ordering them to move to another location, because the issue was not preserved below and thus not presented to the Court); <u>Reichle v. Howards</u>, 566 U.S. 658, n.4, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012) ("We need not (and do not) decide here whether <u>Bivens</u> extends to First Amendment retaliatory arrest claims."); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675, 129 S. Ct. 1973, 173 L. Ed. 2d 868 (2009) (assuming without deciding that <u>Bivens</u> extended to First Amendment claim that former U.S. Attorney General and Director of the FBI violated federal detainee's First and Fifth Amendment rights by subjecting him to harsh conditions of confinement on account of his race, religion, or national origin, because the federal officials "did not press the issue"). The

Supreme Court has never expressly recognized a <u>Bivens</u> claim based upon the First

Amendment, and has in fact refused to extend <u>Bivens</u> to a First Amendment speech

claim involving federal employment. *See* <u>Bush</u>, 462 U.S. at 390.

The proper test for determining whether a case presents a new <u>Bivens</u> context

is to determine whether the case "is different in a meaningful way" from previous

<u>Bivens</u> cases decided by the Supreme Court. <u>Ziglar</u>, 137 S. Ct. at 1859. If it is, then

the context is new. *See id.* The Court suggested that the following examples might

prove instructive:

> A case might differ in a meaningful way because of the rank of the
> officers involved; the constitutional right at issue; the generality or
> specificity of the official action; the extent of judicial guidance as to how
> an officer should respond to the problem or emergency to be confronted;
> the statutory or other legal mandate under which the officer was
> operating; the risk of disruptive intrusion by the Judiciary into the
> functioning of other branches; or the presence of potential special factors
> that previous <u>Bivens</u> cases did not consider.

<u>Ziglar</u>, 137 S. Ct. at 1860.

Here, the constitutional right at issue is Rager's First Amendment right to file

prison grievances concerning the conditions of his confinement, pursuant to the BOP's

Administrative Remedy Program set forth in 28 C.F.R. §§ 542.10–19 and BOP Policy

Statement 1330.18, without retaliatory action by prison officials. The constitutional

right at issue here is different from the constitutional rights at issue in the three cases

where the Court approved a <u>Bivens</u> remedy, i.e., the Fourth Amendment, the equal protection component of the Fifth Amendment, and the Eighth Amendment, *see* <u>Bivens</u>, 403 U.S. 388, <u>Davis</u>, 442 U.S. 228, and <u>Chappell</u>, 462 U.S. 296, respectively. Further, Rager's claims bear little resemblance to the three <u>Bivens</u> claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma, *see* <u>Bivens</u>, 403 U.S. 388; <u>Davis</u>, 442 U.S. 228; <u>Chappell</u>, 462 U.S. 296, respectively. The undersigned therefore concludes that this case is a new <u>Bivens</u> context. In light of this conclusion, a special factors analysis is required before allowing this damages suit to proceed.

Defendants contend the "physical injury" requirement of the Prison Litigation Reform Act of 1995 ("PLRA") is a "special factor counselling hesitation" in the court's extending the <u>Bivens</u> remedy to the context of a prisoner's First Amendment retaliation claim (Amended Motion for Summary Judgment at 35–37). Defendants argue that in passing the PLRA, Congress "placed a series of controls on prisoner suits … designed to prevent sportive filings in federal court." <u>Skinner v. Switzer</u>, 562 U.S. 521, 535–36 (2011) (citing 42 U.S.C. § 1997e; 28 U.S.C. § 1915(b)(1); 28 U.S.C. §

1915(f); U.S.C. § 1915(g)). Defendants contend Congress did so with the intent to "reduce the quantity of inmate suits." <u>Jones v. Bock</u>, 549 U.S. 199, 223 (2007). Defendants contend the "bipartisan measure" primarily sought to spare taxpayers the estimated "$80 million each year" that it cost to pay "for corrections lawyers (to defend these lawsuits), prison staff (to gather information to respond to the suits and transport the offenders to the courthouse), court clerks (to process mountains of legal filings) and judges (to rule on the claims)." 2009 WL 2008131 (Statement of Jon Ozmint, Director, South Carolina Department of Corrections to Committee on House Judiciary Subcommittee on Crime, Terrorism, and Homeland Security). Defendants further argue that the passage of the PLRA also represented "an effort to curb the involvement of the federal judiciary in day-to-day prison management." <u>Morales Feliciano v. Rullán</u>, 378 F.3d 42, 50 (1st Cir. 2004).

Defendants contend the physical-injury requirement for damages suits for "mental or emotional injury suffered while in custody," under § 1997e(e), is particularly significant in this case, because First Amendment retaliation claims seldom, if ever, involve physical injury, and Rager has not alleged a physical injury resulting from his First Amendment retaliation claims. Defendants contend that

permitting Rager to maintain a lawsuit alleging only mental and emotional injuries would circumvent Congress' intent under the PLRA.

In response to Defendants' Bivens argument, Rager acknowledges that the Supreme Court has not expressly extended Bivens to First Amendment retaliation claims in the prison context, but he argues that the Court has assumed that a Bivens remedy is available in such a context (Rager's Response to Amended Motion for Summary Judgment at 13–14). Rager further argues that all of the circuit courts have recognized a Bivens remedy in this context, and that Congress has implicitly provided a Bivens remedy.

After considering the special factors necessarily implicated by Rager's First Amendment claims, the undersigned concludes that those factors show that whether a damages action should be allowed is a decision for Congress to make, not the courts. This case has certain features, or "special factors," that were not considered in the Court's previous Bivens cases and might discourage a court from authorizing a Bivens remedy. For one, this is not a case like Bivens or Davis in which "it is damages or nothing." Bivens, 403 U.S. at 410 (Harlan, J., concurring in judgment); Davis, 442 U.S. at 245. Rager had an alternative remedy when Defendants allegedly retaliated against him—he could have filed a civil rights complaint seeking injunctive relief

enjoining the unconstitutional conduct. According to Rager's submissions, he was housed at FCI-Marianna until September 15, 2014, and thus had ample opportunity to seek injunctive relief (*see* Defendants' Undisputed Statement of Facts ¶ 18). Rager's contention that he could not file a civil rights action because Defendants' retaliatory conduct prevented him from exhausting administrative remedies is unavailing, since the Eleventh Circuit has held that retaliation or threats of retaliation may make administrative remedies unavailable to an inmate for exhaustion purposes, thus permitting him to proceed with a civil rights action. *See* Turner v. Burnside, 541 F.3d 1077, 1084–85 (11th Cir. 2008); *see also* Bryant v. Rich, 530 F.3d 1368 1373 n.6 (11th Cir. 2008) (noting, without deciding for this Circuit, that other courts have held administrative remedies are also unavailable, when prison officials prevent the filing of grievances or fail to respond to grievances that are filed). When alternative methods of relief are available, a Bivens remedy usually is not. *See* Ziglar, 137 S. Ct. at 1863 (citing Bush, 462 U.S., at 386–88; Schweiker, 487 U.S. at 425–26; Malesko, 534 U.S. at 73–74; Minneci, 565 U.S. at 125–26).

Furthermore, legislative action suggests that Congress does not want a damages remedy, which is itself a factor counseling hesitation. *See* Ziglar, 137 S. Ct. at 1865. As noted by the Ziglar Court:

Some 15 years after <u>Carlson</u> was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. *See* 42 U.S.C. § 1997e. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. This Court has said in dicta that the Act's exhaustion provisions would apply to <u>Bivens</u> suits. *See* <u>Porter v. Nussle</u>, 534 U.S. 516, 524, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). But the Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the <u>Carlson</u> damages remedy to cases involving other types of prisoner mistreatment.

137 S. Ct. at 1865. Further evidence that Congress does not want a damages remedy for First Amendment retaliation or access-to-courts claims filed by prisoners is the provision in § 1997e which limits a prisoner's recovery for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act. *See* 42 U.S.C. § 1997e(e).

Given the Supreme Court's expressed caution about extending the <u>Bivens</u> remedy, the new-context inquiry is easily satisfied in this case. Further, there are "special factors counselling hesitation" in the court's extending the <u>Bivens</u> remedy to a suit like this one in the absence of affirmative action by Congress. Therefore, the undersigned recommends that the district court decline to extend the <u>Bivens</u> remedy to Rager's First Amendment claims.

B.    <u>Qualified Immunity for Defendants Malone, Simmons, and Watts</u>

Regardless of the availability of a damages remedy for the alleged First Amendment violations, Defendants Malone, Simmons, and Watts are entitled to judgment in their favor on qualified immunity grounds. In the qualified immunity analysis, Defendants bear the initial burden of establishing they were acting within their discretionary authority. In determining whether an employee acted within his discretionary authority, the Eleventh Circuit engages in a "two-fold" inquiry. *See* Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (internal quotation marks and citation omitted). At the first step, the court asks "whether the government employee was … performing a legitimate job-related function (that is, pursuing a job-related goal)." *Id.* "Put another way, to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Id.* At the second step, the court asks whether the government employee was performing the job-related function "through means that were within his power to utilize." *Id.*

Lieutenant Malone states that he met with Rager on March 22, 2011, in an attempt to informally resolve Rager's administrative remedy, and did so as part of his duties as a Lieutenant in the SHU, which included the duty of attempting to informally

resolve administrative remedies concerning issues involving the SHU. Rager argues

Malone was not performing a discretionary function because he did not attempt to

informally resolve any grievance; instead, Malone only threatened, intimidated, and

attempted to dissuade him from pursuing his administrative remedies (*see* ECF No.

172 at 10–11).

    As discussed supra, the discretionary function test asks whether the defendant

was performing a function that, <u>but for the alleged constitutional infirmity</u>, would

have fallen within his legitimate job description. *See* <u>Holloman</u>, 370 at 1265

(emphasis added). Lieutenant Malone's meeting with Rager on March 22, 2011,

regarding Rager's administrative remedies concerning matters relating to his

placement in the SHU, fell within Malone's legitimate job description. Further,

Malone was performing the job-related function through means that were within his

power to utilize; indeed, Rager admits that Warden Augustine authorized the meeting

between Malone and Rager to address Rager's administrative remedies. *See* BOP

Program Statement 1330.18, Section 7 (authorizing the warden to establish procedures

to allow for informal resolution of issues between inmates and staff). Therefore, the

court is satisfied that Lieutenant Malone was acting within his discretionary authority.

The declarations of Regional Coordinator Simmons and National Coordinator Watts demonstrate that they were acting within their discretionary authority when they processed Rager's regional and national administrative appeals. Rager offers no argument in support of his conclusory assertion that Simmons and Watts were not preforming discretionary functions (*see* ECF No. 172 at 10). The undersigned concludes that Regional Coordinator Simmons and National Coordinator Watts have also satisfied the first prong of the qualified immunity analysis. The burden now shifts to Rager to show that show that Defendants' conduct violated a federal right that was clearly established at the time of the allegedly unconstitutional conduct.

As previously discussed, the court cannot consider just any case law to decide if a right was clearly established. Only binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis. *See* McClish, 483 F.3d at 1237. And as the Supreme Court recently emphasized, "'clearly established law' should not be defined at a high level of generality. . . . [T]he clearly established law must be 'particularized' to the facts of the case." White, 137 S. Ct. at 551–52.

The undersigned reviewed each of the cases cited by Rager which qualify as precedent for qualified immunity purposes (*see* ECF No. 172), and describes what each of those cases "clearly establish," as follows[6]:

- <u>Johnson v. Avery</u>, 393 U.S. 483 (1969):  holding that a state prison regulation barring inmates from assisting other prisoners in preparing petitions for post-conviction relief was invalid as in conflict with federal right of habeas corpus, despite the state's claim that the requirement was necessary to maintain prison discipline, where the state did not provide available alternative to assistance provided by other inmates.

- <u>Cruz v. Beto</u>, 405 U.S. 319 (1972):  holding that a complaint of a Buddhist state prisoner—who alleged that defendants had refused to allow Buddhists the right to hold religious services; that defendants maintained a religious program within the penal system which provided religious facilities for Protestant, Jewish and Roman Catholic adherents; that religious participation was encouraged by defendants as necessary steps toward rehabilitation; and that points of good merit were given to inmates by defendants as a reward for religious participation in Protestant, Jewish and

---

[6] The cases not listed here cannot serve as precedent for the qualified immunity analysis, because they include cases that were decided by other circuit courts, decided by the Eleventh Circuit after March 22, 2011 (the date of Lieutenant Malone's meeting with Rager), or are unpublished decisions with no precedential value.

Case No.: 5:15cv35/MW/EMT

Roman Catholic faiths which enhanced the inmate's eligibility for promotion in class, job assignment and parole—stated a claim upon which relief could be granted under the First Amendment.

- <u>Ashcroft v. al-Kidd</u>, 563 U.S. 741 (2011): holding that the arrest of a United States citizen pursuant to a warrant issued under the federal material-witness statute did not violate clearly established law, thus, the Attorney General, who allegedly had formulated a policy of using the statute pretextually to detain individuals who were suspected of supporting terrorism but for whom evidence was insufficient to charge the individual with a crime, was entitled to qualified immunity in a <u>Bivens</u> action brought by an arrestee; at the time of the arrest, not a single judicial opinion had held that pretext could render an objectively reasonable arrest pursuant to a material-witness warrant unconstitutional under the Fourth Amendment.

- <u>Hooks v. Kelley</u>, 463 F.2d 1210 (5th Cir. 1972): holding that prisoner plaintiff's allegations, that he was transferred without cause from a minimum security status to a medium security status, resulting in loss of certain privileges including the availability of law books and adequate medical care, and asserting that his transfer was because of his persistent use of courts to attack his convictions and complain of prison conditions, stated a plausible First Amendment claim.

- _Bridges v. Russell_, 757 F.2d 1155 (11th Cir. 1985):  holding that prisoner plaintiff's allegations, that he was transferred to another facility because he (1) filed a grievance against his work supervisor alleging racial discrimination in the assignment of work tasks, (2) actively encouraged other inmates to protest this treatment by signing a petition, and (3) prepared, upon request, a similar grievance for another prisoner to sign, were sufficient to state a plausible claim of retaliation.

- _Wright v. Newsome_, 795 F.2d 964 (11ht Cir. 1986):  holding that prisoner plaintiff's allegation that prison officials searched his cell and, in the course of the search, destroyed some of his photographs and legal papers, and seized his legal pleadings and law book concerning his challenge to his conviction, stated a plausible First Amendment claim of retaliation and denial of access to the courts.

- _Wildberger v. Bracknell_, 869 F.2d 1467 (11th Cir. 1989):  holding that a prisoner plaintiff's allegation that he had been disciplined as a result of filing several grievances stated a plausible claim of retaliation.

- _Thomas v. Evans_, 880 F.2d 1235 (11th Cir. 1989):  holding that the record failed to support the district court's dismissal of prisoner's civil rights complaint under Rule 11 of the Federal Rules of Civil Procedure as a sanction.

●　Farrow v. West, 320 F.3d 1235 (11th Cir. 2003):  holding that the prisoner plaintiff failed to show a causal connection between his complaints and the alleged denial of medical treatment by the defendant nurse and her nursing staff.

●　Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005):  holding that the following conduct by the county sheriff and two deputies against two private citizens, after the citizens supported a county referendum opposed by the sheriff, constituted "adverse action" for First Amendment purposes:  (1) defendants followed, pulled over, cited, intimidated, or otherwise harassed the plaintiffs; (2) defendants allegedly accessed confidential government databases containing information on the plaintiffs; (3) defendants attempted to obtain arrest warrants against the plaintiffs without probable cause; and (4) defendants produced and mailed to local residents flyers depicting the plaintiffs as criminals terrorizing the county.

●　Smith v. Mosley, 532 F.3d 1270 (11th Cir. 2008):  holding that the filing of disciplinary charges against the prisoner plaintiff constituted "adverse action."

●　Douglas v. Yates, 535 F.3d 1316 (11th Cir. 2008):  holding that exposing the prisoner plaintiff to mental abuse, physical intimidation, verbal threats of injury and punishment, filing of unfounded disciplinary charges, placement in more severe confinement, and threats after his release from that confinement that inmate would be

exposed to more punishment if he continued to pursue his grievance, constituted "adverse action."

- <u>Turner v. Burnside</u>, 541 F.3d 1077 (11th Cir. 2008): holding that a prison official's serious threats of substantial retaliation against an inmate for lodging, in good faith, a grievance makes the administrative remedy "unavailable," and thus lifts the Prison Litigation Reform Act's administrative exhaustion requirement as to the affected part(s) of the process if both of these conditions are met: (1) the threat actually did deter the inmate from lodging a grievance or pursuing a particular part of the process, and (2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the grievance process that the inmate failed to exhaust.

The court assumes, as it must at the summary judgment stage, that Lieutenant Malone told Rager he could be returned to the SHU if he persisted in accusing Lieutenant Buford of lying, and that it would "turn out badly" for Rager if he continued to use the administrative remedy program in an attempt to prove his case against Buford (i.e., that Lieutenant Buford had improperly used force on July 13, 2010, and then lied about it, and that institutional officials placed Rager in the SHU and maintained him there for four months as punishment for his accusing Buford of

lying and using excessive force).  The problem for Rager is that he has not identified,

and the court has not found, a case which clearly established at the time of Malone's

verbal threats (in March of 2011), that mere verbal threats of that nature, without more

(for example, without physical intimidation, filing of unfounded disciplinary charges,

placement in more severe confinement, transfer to a higher security prison, etc.) were

prohibited by the First Amendment.  Simply put, existing precedent did not place the

First Amendment retaliation question beyond debate.  Therefore, Lieutenant Malone

is entitled to qualified immunity on Rager's First Amendment claim.[7]

       With regard to Regional Director Simmons and National Administrator Watts,

the summary judgment evidence, viewed in the light most favorable to Rager, would

---

[7] The court feels compelled to offer this comment.  Lieutenant Malone's inquiry of Rager "What are you trying to accomplish?" by filing formal grievance #629349, #629352, #629354, and #629355 on March 4, 2011, was a good question.  Rager's answer essentially admitted that he was attempting to use the administrative remedy program to prove his case that Lieutenant Buford had improperly used force on July 13, 2010, and then lied about it, and that officials had placed and maintained him in the SHU for four months as punishment for his accusing Buford of lying and using excessive force.  But by the time Rager filed the grievances on March 4, 2011, the investigation of the incident was over, and he had been out of the SHU and back in the general population for more than three months.  Additionally, Rager admits that following the investigation of his complaint of excessive force, Lieutenant Buford was disciplined (*see* First Amended Complaint ¶ 13).  And the Administrative Remedy Program was not the appropriate means for asserting tort claims or requesting documents, because there were statutorily-mandated procedures in place for pursing tort claims through the Federal Tort Claims Act, and requesting information through the Freedom of Information Act, *see* 28 C.F.R. §§ 543.30–.31 and 28 C.F.R. §§ 513.30–.68, respectively.  It thus did not appear that Rager's use of the Administrative Remedy Program was in keeping with the problem-solving purpose of the program.  *See* 28 C.F.R. § 542.10 ("The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement."); *see id.*, § 542.11(b) ("Inmates have the responsibility to use this Program in good faith and in an honest and straightforward manner.").

not permit a reasonable fact finder to conclude that Rager satisfied the "adverse action" element of a retaliation claim. Assuming that Simmons and Watts' rejected, returned, and denied Rager's numerous administrative appeals for improper reasons, and failed to respond to some of Rager's appeals within the time frames set forth in BOP policy, such conduct would not likely deter a prisoner of ordinary firmness from utilizing the administrative grievance process. Additionally, established precedent at the relevant time did not give Regional Director Simmons or National Administrator Watts fair warning that this conduct was unconstitutional under the First Amendment. Therefore, neither prong of the qualified immunity standard is satisfied with respect to Rager's First Amendment claims against Simmons and Watts.

      C.    <u>Failure to State a Plausible First Amendment Claim Against Warden Augustine</u>

The only retaliation claim against Warden Augustine that is not time barred is Rager's claim that Warden Augustine "sent" Lieutenant Malone to meet with Rager on March 22, 2011, and "make these [Rager's pending administrative remedy requests] go away." (*see* First Amended Complaint ¶ 18; Rager Aff ¶ 6, ECF No. 165-1 at 1).

According to BOP regulations and policy, part of Warden Augustine's responsibilities was to facilitate informal resolution of Rager's pending administrative

complaints. *See* 28 C.F.R. § 542.13(a); BOP Program Statement 1330.18, Section 7.

Lieutenant Malone states that his meeting with Rager on March 22, 2011, was an

attempt at informal resolution of Rager's administrative remedy as required by BOP

Program Statement 1330.18, Section 7 (Malone Decl. ¶ 4). Because there is evidence

of a legitimate reason for the meeting between Lieutenant Malone and Rager, and

because regulatory actions taken by prison officials are presumed to be reasonable,

Rager must produce specific, nonconclusory factual allegations that establish

improper motive causing cognizable injury. Here, Rager has alleged no specific,

nonconclusory facts that plausibly suggest retaliation as the but-for cause of the

meeting between him and Malone. Because Malone would have met with Rager to

resolve the grievances anyway, Rager's retaliation claim against Warden Augustine

fails for lack of a causal connection.

Moreover, there is no relief which may be granted on Rager's retaliation claim

against Warden Augustine. Any request for declaratory or injunctive relief is moot,

since Rager is not housed at FCI-Marianna and he never has been since

commencement of this lawsuit. Furthermore, since there appears no reason to believe

that Rager will again be confined at FCI-Marianna under the same circumstances, the

narrow exception for cases that are capable of repetition yet evading review does not

apply. *See* <u>Smith v. Allen</u>, 502 F.3d 1255, 1267 (11th Cir. 2007) ("The general rule in our circuit is that a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief."); <u>Spears v. Thigpen</u>, 846 F.2d 1327, 1328 (11th Cir. 1988); <u>Zatler v. Wainwright</u>, 802 F.2d 397, 399 (11th Cir. 1986) (inmate's release from prison mooted claim for declaratory and injunctive relief); <u>Tucker v. Phyfer</u>, 819 F.2d 1030, 1035 (11th Cir. 1987) (claim of prisoner seeking declaratory relief regarding conditions in which he was held as a juvenile became moot when he reached the age of majority); <u>Wahl v. McIver</u>, 773 F.2d 1169, 1173 (11th Cir. 1985) (an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred); <u>McKinnon v. Talladega Cnty.</u>, 745 F.2d 1360, 1363 (11th Cir. 1984) (inmate's transfer to a different jail moots claim for declaratory and injunctive relief); <u>Dudley v. Stewart</u>, 724 F.2d 1493, 1494 (11th Cir. 1984) (transfer from county jail to state prison mooted claims for injunctive and declaratory relief against county jailers).

Additionally, in light of the conclusion that a <u>Bivens</u> remedy should not extend to Rager's First Amendment retaliation claims, and in light of the limitation on recovery set forth in 42 U.S.C. § 1997e(e), monetary damages are not recoverable.

Rager's First Amendment claim against Warden Augustine should be dismissed for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

D.    Access-to-Courts Claim

As a final matter, although the District Judge limited remand to only Rager's First Amendment retaliation claims (*see* ECF No. 106 at 3), the undersigned deems it necessary to address Rager's persistent pursuit of his First Amendment denial-of-access-to-courts claim (*see* ECF No. 172 at 5–10, 11–12).

It is settled law that interference with an inmate's access to the courts is a violation of a First Amendment right actionable under section 1983.  *See* Lewis v. Casey, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996); Bounds v. Smith, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977); Chandler v. Baird, 926 F.2d 1057 (11th Cir. 1991).  However, as established in Lewis, to successfully allege a constitutional violation based upon a denial of access to courts, Rager must specifically show how he was actually harmed or prejudiced with respect to the litigation in which he was involved.  518 U.S. at 349.  The type of prejudice that is deficient in the constitutional sense is that which hinders the inmate's ability to actually proceed with his claim; there is no constitutional mandate "to suggest that the

State must enable the prisoner to discover grievances, and to litigate effectively once in court." *Id.* at 354. Importantly, "the injury requirement is not satisfied by just any type of frustrated legal claim." *Id.* Rager must show that he was prejudiced in a criminal appeal or post-conviction matter, or in a civil rights action seeking "to vindicate 'basic constitutional rights.'" *Id.* at 354–55 (quoting Wolff v. McDonnell, 418 U.S. 539, 579, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)). Furthermore, he must allege actual injury "such as a denial or dismissal" and show that presentation of his case was impeded because of Defendants' actions. Wilson v. Blankenship, 163 F.3d 1284, 1290–91 (11th Cir. 1998) (citing Lewis); *see also* Bass v. Singletary, 143 F.3d 1442, 1445–46 (11th Cir. 1998). Moreover, Rager cannot show an injury unless he shows that the case he was unable to pursue had arguable merit. Lewis, 581 U.S. at 353 n.3; Wilson, *supra*.

Rager's access-to-courts claims are based upon the argument that the presentation of the instant federal civil rights action was impeded because of Warden Augustine and Lieutenant Malone's threats on March 22, 2011, and Regional Coordinator Simmons and National Coordinator Watts' denying, rejecting, and failing to timely respond to Rager's administrative appeals. However, viewing the evidence in the light most favorable to Rager, no reasonable juror could find that Rager's ability

to file this lawsuit, or to do so in a timely manner, was impeded by any Defendant's conduct. The summary judgment record demonstrates that even after the alleged threats on March 22, 2011, Rager was undeterred in pursuing administrative grievances, including administrative appeals of the four grievances which allegedly were the subject of Malone's alleged threats. Further, Rager cannot show that Regional Coordinator Simmons or National Coordinator Watts' denying, rejecting, and failing to timely respond to Rager's administrative appeals prejudiced him in the filing of this civil rights action, because the summary judgment record demonstrates that by April 30, 2013, Rager had either received responses to his appeals, or the administrative deadline for a response had expired and he could thus proceed to the next level, including the filing of a federal civil rights action. By April 30, 2013, Rager still had over a year on the statute-of-limitations clock to file his civil rights complaint, yet he did not do so until February 24, 2015. Rager's allegations fail to plausibly suggest that he suffered actual injury as a result of the conduct of Lieutenant Malone, Warden Augustine, Regional Coordinator Simmons, or National Coordinator Watts; therefore, his allegations fail to state a plausible First Amendment claim of denial of access to the courts.

V.     CONCLUSION

For the reasons discussed herein, the district court should decline to extend the Bivens remedy to Rager's First Amendment claims. Additionally, viewing the evidence in the light most favorable to Rager, the state of the law at the time of Lieutenant Malone's alleged verbal threats (in March of 2011) did not give Lieutenant Malone fair warning that his verbal threats violated the First Amendment. Likewise, with regard to Regional Coordinator Simmons and National Coordinator Watts, the state of the law at the time they processed Rager's administrative appeals did not give them fair warning that their conduct violated the First Amendment. With regard to Warden Augustine, Rager's factual allegations, accepted as true, fail to state a plausible claim on which relief may be granted. Finally, to the extent Rager persists in pursuing a First Amendment access-to-court claim, the evidence viewed in his favor fails to show a constitutional violation. Therefore, summary judgment should be granted in Defendants' favor.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the amended motion for summary judgment filed by Defendants Malone, Simmons, and Watts (ECF No. 162) be **GRANTED**.

2.     That Plaintiff's claims against Defendant Augustine be **DISMISSED**

**with prejudice** for failure to state a claim upon which relief may be granted, pursuant

to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

3.     That the clerk of court be directed to enter judgment in favor of all

Defendants and close the file.

At Pensacola, Florida, this 8<u>th</u> day of November 2017.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**.